FILED

2023 Sep-25  PM 04:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| WANDA ANN MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:22-cv-00491-NAD |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER REVERSING AND REMANDING THE DECISION OF THE COMMISSIONER

Pursuant to 42 U.S.C. § 405(g), Plaintiff Wanda Ann Moore appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on her claim for disability benefits. Doc. 1; Doc. 10-3 at 1. Plaintiff Moore applied for disability benefits with an alleged onset date of May 1, 2020. Doc. 10-6 at 21. The Commissioner denied Moore's claim for benefits. Doc. 10-3 at 2–4, 26. In this appeal, the parties consented to magistrate judge jurisdiction. Doc. 12; 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73.

After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **REVERSES** and **REMANDS** the Commissioner's decision.

## ISSUES FOR REVIEW

In this appeal, Moore argues that the court should reverse the Commissioner's decision for two reasons:   (1) the Administrative Law Judge (ALJ) erred in evaluating Moore's symptoms, including her subjective testimony regarding those symptoms; and (2) the ALJ improperly evaluated the opinions of the state agency consultants—Dr. Robert Estock and Dr. Angela Register—and as a result the ALJ's conclusion regarding Moore's mental "residual functional capacity" (RFC) was not supported by substantial evidence.  Doc. 13 at 2; Doc. 19 at 1, 4.

Because the court will reverse and remand for further consideration of the opinions of Dr. Estock and Dr. Register, the court need not reach the merits of the other issue that Moore raised in this appeal.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from

anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages: (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled. The ALJ must determine the following:

(1)    whether the claimant is engaged in substantial gainful activity;

(2)    if not, whether the claimant has a severe impairment or combination of impairments;

(3)    if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)    if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)    if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to

demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211.  At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).  If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs.  *Id.*  So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant.  *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act.  The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.**   With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of*

*Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "The ALJ must rely on the full range of evidence . . . , rather than cherry picking records from single days or treatments to support a conclusion." *Cabrera v. Commissioner of Soc. Sec.*, No. 22-13053, 2023 WL 5768387, at *8 (11th Cir. Sept. 7, 2023).

**B.** With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.

## BACKGROUND

### A.     Procedural background

In June 2020, Moore applied for disability insurance benefits under Title II and Part A of Title XVIII of the Social Security Act.  Doc. 10-6 at 21–24.[1]  In her application, Moore alleged that she became disabled on May 1, 2020.  Doc. 10-6 at 21.  On September 15, 2020, the SSA initially denied Moore's disability claim.  Doc. 10-4 at 18; Doc. 10-5 at 4–9.

On September 22, 2020, Moore requested that the SSA reconsider her application for disability insurance benefits.  Doc. 10-5 at 13.  On October 28, 2020, the SSA denied Moore's request for reconsideration.  Doc. 10-4 at 34; Doc. 10-5 at 15–17.

The SSA granted Moore's request for a hearing (Doc. 10-5 at 18, 44–48); and, on July 14, 2021, a telephonic hearing was held before an ALJ (Doc. 10-3 at 33–58; Doc. 10-5 at 49–53).  A vocational expert or "VE"—Sharon Lane—also appeared and testified in the hearing.  Doc. 10-3 at 33, 55–58.

On September 8, 2021, the ALJ issued an unfavorable decision, determining that Moore was not disabled under the Social Security Act.  Doc. 10-3 at 13–26.

Through a representative, Moore sought review from the SSA Appeals

---

[1] On May 5, 2020, Moore completed an abbreviated application for disability insurance benefits (Doc. 10-6 at 12–17), and an abbreviated application for supplemental security income benefits (Doc. 10-6 at 2–11).

Council, arguing that the ALJ's decision was based on legal error, among other things.  Doc. 10-5 at 79–81; Doc. 10-7 at 114–15; *see* Doc. 10-7 at 116.

On February 22, 2022, the Appeals Council denied Moore's request for review, finding that there was "no reason under [its] rules to review the [ALJ's] decision."  Doc. 10-3 at 2.

After the Appeals Council denied Moore's request for review (Doc. 10-3 at 2–5), the ALJ's decision became final for purposes of judicial review.  *See* 42 U.S.C. § 405(g).

### B.    Factual background

Moore was born on May 8, 1963, and was 58 years old at the time of the ALJ hearing.  Doc. 10-3 at 38; Doc. 10-6 at 21.

In her initial application for benefits, Moore alleged that she last worked on May 1, 2020 (Doc. 10-7 at 6), and that she became disabled on that same date (Doc. 10-6 at 21; Doc. 10-7 at 2).  Moore stated that she was physically unable to work because of degenerative disc disease—disc protrusion and bulge, and scoliosis.  Doc. 10-7 at 6.

In a work history report dated June 5, 2020, Moore stated that she worked as a housekeeper from May 2013 to May 2020.  Doc. 10-7 at 11.  Moore stated that she was required to walk or stand eight hours per day while working as a housekeeper, and that she "would lift and carry [a] vacuum or other cleaning equipment, furniture,

laundry, [and] drapery." Doc. 10-7 at 12.

Moore completed an additional work history report on July 28, 2020, in which she stated that she also previously had worked as a painter, a packer, a shuttle driver, a breakfast cook, and a "houseman." Doc. 10-7 at 41–49. She also stated that she worked at Birmingham Fastener, where she carried iron pipe restraints all day. Doc. 10-7 at 43. In her second work history report, Moore stated that while working as a hotel housekeeper she also "did maintenance like changing light bulbs, painting, and patchwork," and that she would "take guest[s] where they needed to go like [the] airport." Doc. 10-7 at 44. She stated that she would carry paint cans and "some mornings [she] would cook breakfast for the guest[s]." Doc. 10-7 at 44.

On July 14, 2020, Moore submitted an adult function report. Doc. 10-7 at 33–40. Moore reported that she lives in a house with her husband, and that on a daily basis she wakes up, eats breakfast, takes her medication for depression, then "[lies] around in [her] living room and watch[es] TV until time for [her] husband to come home." Doc. 10-7 at 33. She reported that she then makes "something simple for supper," and "talk[s] to [her] husband for a while," then takes her medication and goes back to bed. Doc. 10-7 at 33.

Moore reported that she has some issues with personal care, because it is difficult to bend to put on pants or wash her legs or feet when bathing, but that she can wash her hair fine, and feed herself fine. Doc. 10-7 at 34. She noted that she

8

can stand "for only about 10 to 15 [minutes] before [she] start[s] hurting in [her] back and hip." Doc. 10-7 at 34. Moore also reported that her sleep is affected by her back and leg pain, because her "back and leg hurts so bad at times that [she] can't get comfortable." Doc. 10-7 at 34.

Moore reported that she does not need reminders to take her medications or to take care of her personal needs or grooming. Doc. 10-7 at 35. She also reported that she prepared simple meals on a daily basis, and that she can clean her house "a little at a time." Doc. 10-7 at 35. She reported that it takes her "about 1 to 1 1/2 hours to do [her] laundry and about 3 hours to clean [her] house," and that she needs assistance in carrying the laundry basket to her room. Doc. 10-7 at 35.

Moore reported that she goes outside "[a]bout once a week for about 5 [minutes]," that she is able to go out alone, and that she drives a car when traveling. Doc. 10-7 at 36. She also reported that she goes grocery shopping "[a]bout 2 time[s] in a month," for "about 30 [minutes] each time." Doc. 10-7 at 36. Moore reported that she can pay bills, count change, handle a savings account, and use a checkbook. Doc. 10-7 at 36. But she reported that she has lost interest in her hobbies since her condition began. Doc. 10-7 at 37. Moore also reported that she has lost interest in socializing since her condition began, but that she will "go see [her] mother when [she has] a good day when [she is] not as depressed." Doc. 10-7 at 36–37.

Moore reported that her medical conditions affect the following: lifting,

squatting, bending, standing, reaching, walking, sitting, kneeling, talking, stair climbing, memory, completing tasks, concentration, and understanding.  Doc. 10-7 at 38.  She also reported that she "can lift about 6 pounds," and that she "can stand for about 15 to 30 [minutes] before [she has] to sit down."  Doc. 10-7 at 38.

Moore reported that she can follow written and spoken instructions, and that she gets along with authority figures "very well."  Doc. 10-7 at 38–39.  She reported that she handles stress "[n]ot very well," but handles changes in routine "pretty well."  Doc. 10-7 at 39.

Moore reported that she uses a cane or walker, "[w]hen [she is] walking and it hurts to walk, but [she does not] use them all the time."  Doc. 10-7 at 39.

### C.     Consultative examinations

On September 14, 2020, Dr. Robert Estock, M.D.—a state agency psychiatrist—reviewed Moore's medical records, and completed a medical evaluation (Doc. 10-4 at 8–10), and a mental RFC assessment (Doc. 10-4 at 13–15).  Dr. Estock's medical evaluation and RFC assessment were included in the record as part of the "Disability Determination Explanation" for the SSA's denial of Moore's disability claim on initial review.  *See* Doc. 10-4 at 2–16.

In the mental RFC assessment, Dr. Estock found that Moore was "able to understand and remember simple instructions, but not detailed ones," that she was "able to carry out short and simple instructions," and that she could "attend and

concentrate for [two hour] periods on simple tasks." Doc. 10-4 at 13–14. Dr. Estock also found that Moore "would benefit from familiar repetitive work routine but should avoid excessive workloads, quick decision making, rapid changes and multiple changes." Doc. 10-4 at 14. Dr. Estock found that Moore's ability to interact with the general public was "[m]oderately limited," that "[c]ontact with the public should be casual," and that "[f]eedback from coworkers and supervisors should be tactful, nonconfrontational and supportive." Doc. 10-4 at 14. Dr. Estock also found that Moore "could adapt to infrequent, well explained changes." Doc. 10-4 at 14.

On October 28, 2020, Dr. Angela Register, Ph.D.—a state agency psychologist—reviewed Moore's medical records, and completed a medical evaluation (Doc. 10-4 at 25–27), and a mental RFC assessment (Doc. 10-4 at 30–32). Dr. Register's medical evaluation and RFC assessment were included as part of the "Disability Determination Explanation" for the denial for Moore's disability claim on reconsideration. *See* Doc. 10-4 at 19–33.

Dr. Register's mental RFC assessment mirrored Dr. Estock's assessment. In the mental RFC assessment, Dr. Register also found that Moore was "able to understand and remember simple instructions, but not detailed ones," that she could "carry out short and simple instructions," and that she could "attend and concentrate for [two hour] periods on simple tasks." Doc. 10-4 at 30–31. Like Dr. Estock, Dr. Register found that Moore "would benefit from familiar repetitive work routine but

should avoid excessive workloads, quick decision making, rapid changes and multiple changes."  Doc. 10-4 at 31.  And, Dr. Register found that Moore's ability to interact with the general public was "[m]oderately limited," that "[c]ontact with the public should be casual," and that "[f]eedback from coworkers and supervisors should be tactful, nonconfrontational and supportive."  Doc. 10-4 at 31.  Dr. Register also found that Moore "could adapt to infrequent, well explained changes."  Doc. 10-4 at 32.

### D.    The ALJ hearing

In the July 2021 ALJ hearing, Moore testified that eighth grade was the highest grade she completed in school.  Doc. 10-3 at 38.

Moore testified that she last worked in housekeeping for a hotel, Town Place Suites, in May 2020.  Doc. 10-3 at 38, 41–42.  She testified that this was a full-time job, and that the heaviest amount she had to lift in that job was 20 to 30 pounds.  Doc. 10-3 at 39, 44.  Moore testified that she spent most of her time in that job standing or walking, and that she did not have a supervisory role.  Doc. 10-3 at 39.

Moore testified that, as a housekeeper, she worked a breakfast shift, and then when breakfast was over she worked in a "houseman" role.  Doc. 10-3 at 42.  During the breakfast shift, Moore had to heat up pre-made items.  Doc. 10-3 at 43.  She testified that she also performed simple maintenance, such as fixing a television or caulking a plumbing issue, and that she sometimes drove a shuttle van.  Doc. 10-3

at 43–45.  Moore testified that, "towards the end there," she was performing a primarily housekeeping role at the hotel.  Doc. 10-3 at 46.

Moore also testified that she previously had worked for a temp service, which included working a job on a production line.  Doc. 10-3 at 40–41.  In that position, Moore was required to lift 30 to 50 pounds, and she spent most of the day standing or walking.  Doc. 10-3 at 41.

Moore testified that she has lower back problems, including sharp pain that moves "down [her right] leg and to the foot."  Doc. 10-3 at 47.  She testified that she can stay seated for "[p]robably 30 minutes," but then needs to change positions because it "feels like the bones are pinching together on the nerves and feeling like a knife stabbing in [her] back."  Doc. 10-3 at 47.  Moore testified that she could also stand without leaning on anything for about 30 minutes, before the same type of pain would occur.  Doc. 10-3 at 47.  She testified that she could not walk the full length of a football field without taking a break, but that she "could walk 30 feet without stopping."  Doc. 10-3 at 47–48.  She testified that she could not "pick up a full gallon of milk with one hand and carry it 15 feet without aggravating . . . [her] back pain." Doc. 10-3 at 48.

Moore also testified that she had developed some issues with the veins in her legs, but that doctors were still "trying to figure out exactly what's going on."  Doc. 10-3 at 48.  She testified that her "right [leg] would swell up a lot worse than the left

one," and that with the swelling "it gets hot and [she] can't stand up."  Doc. 10-3 at

49.  She testified that the swelling occurs in "the first 25 to 30 minutes of standing,"

and that it does not go down until she goes to sleep for the night.  Doc. 10-3 at 49.

Moore testified that it "stay[s] sw[ollen] up all day no matter what [she tries] to do,

no matter what they tell [her] to do or putting an ace bandage on it eight times a day

or compression socks."  Doc. 10-3 at 50.  She testified that the swelling occurs from

the knee down, and that after the swelling begins she can stand for "[p]robably 10

minutes."  Doc. 10-3 at 50–51.

Moore testified that she has to elevate her right leg to waist level for "about

five hours every day."  Doc. 10-3 at 51.  She testified that, if she stands for 35

minutes in the morning, 10 minutes is too long for her to stand for the rest of the

day.  Doc. 10-3 at 52.

Moore testified that she goes out in public by herself about three times per

month.  Doc. 10-3 at 52.  She testified that she does not go out more often because

of her depression, and that she has "bad days where because of mental health issues,

[she] stay[s] all day in bed."  Doc. 10-3 at 52–53.  She testified that these bad days

occur "four to five out of the seven days," and that she has crying spells "certain

days, every day."  Doc. 10-3 at 53.

Moore testified that, if she were asked to remember a grocery list with five

items, she could not remember it "unless [she] wrote it down," and that she could

14

maintain attention for 30 to 45 minutes, if she were doing something she was interested in, like watching a movie.  Doc. 10-3 at 53.

Moore testified that her daughter helps her with household chores, and that there are no household chores she can complete independently, "in one shot without taking a break."  Doc. 10-3 at 54.

As noted above, Sharon Lane (the vocational expert or "VE") also testified in the ALJ hearing.  Doc. 10-3 at 55–59.  VE Lane described Moore's past work as a hotel housekeeper as a light, unskilled job, and her past work as a "packager" as a medium, unskilled job.  Doc. 10-3 at 55.  Lane also described Moore's past work as a maintenance worker as a medium, light as described, semi-skilled job, her past work as a shuttle driver as a light, semi-skilled job, her past work as a breakfast attendant as a medium, unskilled job, and her past work as a "houseman" as a heavy, light as described, unskilled job.  Doc. 10-3 at 55.

Lane testified that a hypothetical individual of Moore's age, education, and work experience, with multiple limitations—including that the individual should avoid ladders, ropes, or scaffolds, should avoid hazardous machines and unprotected heights, could perform work that was rote and routine, can stay in those work activities for 2-hour periods, and can have occasional interaction with the public— still would be able to perform Moore's past work as a housekeeper both as generally performed, and as Moore performed it.  Doc. 10-3 at 56.

Lane testified that, if that hypothetical individual were given additional limitations—including limiting the climbing of stairs and ramps to occasional, and that "as a result of impairment-caused pain" the hypothetical individual would "require additional rest breaks throughout the day and those will be taken at will"— the individual would not be able to perform Moore's past work.  Doc. 10-3 at 57.

### E.    The ALJ's decision

On September 8, 2021, the ALJ issued an unfavorable decision on Moore's claim, finding that she was not disabled from May 1, 2020, through the date of the decision.  Doc. 10-3 at 13–26.  The ALJ found that Moore was insured through December 31, 2025, and that she was required to establish disability on or before that date in order to be entitled to disability insurance benefits.  Doc. 10-3 at 18.

At step one of the sequential analysis, the ALJ found that Moore had not engaged in substantial gainful activity since May 1, 2020, her alleged onset date. Doc. 10-3 at 18.

At step two, the ALJ found that Moore had severe impairments of depression, anxiety, alcohol abuse, and mild lumbar spondylosis at L3-5 with radiculopathy, which "significantly limit [Moore's] ability to perform basic work activities."  Doc. 10-3 at 18.  The ALJ also found that Moore had non-severe impairments of hepatitis C, trigger finger of the right hand and paroxysmal SVT.  Doc. 10-3 at 19.  The ALJ found that "these impairments are well controlled and/or nonsymptomatic," and

that "singly or in combination" these conditions "cannot reasonably be expected to significantly limit [Moore's] physical or mental ability to perform basic work activities."  Doc. 10-3 at 19.

At step three, the ALJ found that Moore did not have an impairment or combination of impairments that met the severity of the impairments in the SSA's "Listing of Impairments," including "Listing 1.16" (lumbar spinal stenosis resulting in compromise of the cauda equina).  Doc. 10-3 at 19–20.

With respect to Moore's mental impairments, the ALJ also reviewed "Listing 12.04" (depressive, bipolar, and related disorders), and "Listing 12.06" (anxiety and obsessive-compulsive disorders); the ALJ found that Moore's "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06."  Doc. 10-3 at 20.  The ALJ "considered whether the 'paragraph B' criteria [were] satisfied," in his analysis of the mental impairment listings.  Doc. 10-3 at 20.  The ALJ "also considered whether the 'paragraph C' criteria [were] satisfied," but concluded that, "[i]n this case, the evidence fails to establish the presence of the 'paragraph C' criteria."  Doc. 10-3 at 21.

In these determinations, the ALJ relied heavily on the opinions of Dr. Estock and Dr. Register.  Doc. 10-3 at 20–21.

At step four, the ALJ then found that Moore had the RFC to perform light

17

work, "except [she] can frequently balance, stoop, kneel, crouch, and crawl. She can frequently climb ramps and stairs. She should avoid ladders, ropes, and scaffolds. She can have occasional exposure to extreme temperatures and excessive vibration. She should avoid hazardous machines and unprotected heights. She can understand, remember, and carry out simple instructions. She can sustain these activities for two-hour periods and therefore over an eight hour day, if afforded normal midmorning, lunch, and midafternoon breaks. She can have occasional interaction with the public. She can handle infrequent changes, meaning work that is rote and routine with duties that can be learned in 30 days or less." Doc. 10-3 at 21.

As part of this conclusion, the ALJ determined that the opinions of Dr. Estock and Dr. Register were "somewhat persuasive," but that Moore's RFC was "not entirely consistent with the opinions." Doc. 10-3 at 24.

Then, based on the testimony of the VE, the ALJ found that Moore had past relevant work as a housekeeper that "satisfie[d] the recency, earnings, and duration requirements for unskilled work." Doc. 10-3 at 25–26. And, based in part on the VE's testimony, the ALJ concluded that Moore was able to "perform [her past work as a housekeeper] as actually and generally performed." Doc. 10-3 at 26.

Consequently, the ALJ determined that Moore was not disabled under the Social Security Act. Doc. 10-3 at 26. Because the Appeals Council found no reason

to review the ALJ's opinion, the ALJ's decision became the final decision of the Commissioner.  Doc. 10-3 at 2–5; *see* 42 U.S.C. § 405(g).

## DISCUSSION

Having carefully considered the record and briefing, the court will reverse and remand because the ALJ improperly evaluated the opinions of the state agency consultants, Dr. Estock and Dr. Register, and as a result the ALJ's conclusion regarding Moore's mental RFC was not supported by substantial evidence.  The court will pretermit consideration of the other issue that Moore raised in this appeal.

**I.    The ALJ improperly evaluated the opinions of the state agency consultants, Dr. Estock and Dr. Register, and as a result the ALJ's conclusion regarding Moore's mental RFC was not supported by substantial evidence.**

The ALJ did not properly evaluate the opinions of the state agency consultants, Dr. Estock and Dr. Register, and as a result the ALJ's conclusion regarding Moore's mental RFC was not supported by substantial evidence.  As explained above, as part of the ALJ's mental RFC determination, the ALJ concluded that the opinions of Dr. Estock and Dr. Register were "somewhat persuasive."  Doc. 10-3 at 24.

In her briefing, Moore argues that the ALJ failed to properly evaluate these consultants' opinions, and that the ALJ's decision "fails to satisfy the regulations' articulation requirements for how the opinion evidence was considered."  Doc. 13 at 15, 17; Doc. 19 at 4.

### A.     Applicable regulations

The SSA has revised its regulations on the consideration of medical opinions for all claims filed on or after March 27, 2017—like the claim in this case.  Under those revised regulations, an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," including the opinion of a treating or examining physician. 20 C.F.R. §§ 404.1520c(a), 416.920c(a).

Instead, the ALJ considers the persuasiveness of a medical opinion according to the following five factors:  (1) supportability; (2) consistency; (3) the relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, and the purpose and extent of the treatment relationship; (4) specialization; and (5) other factors, including evidence showing that the medical source has familiarity with other evidence or an understanding of the SSA's policies and evidentiary requirements.  20 C.F.R. §§ 404.1520c(c), 416.920c(c).

Supportability and consistency are the most important factors, and the ALJ must explain how the ALJ considered those factors.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  "Supportability" requires an ALJ to consider that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior

20

administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" requires an ALJ to consider that "[t]he more consistent a medical opinion[] or prior administrative medical finding[] is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] or prior administrative medical finding[] will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ may explain how the ALJ considered the other factors, but the ALJ is not required to do so. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

Moreover, a "statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the SSA] will determine" that the claimant is "disabled." 20 C.F.R. § 404.1527(d)(1). That is because opinions about whether a claimant is disabled, the claimant's RFC, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

In this case, the ALJ acknowledged those new, revised regulations. The ALJ stated that, "[w]hen evaluating the persuasiveness of the medical opinions and prior administrative medical findings contained in a case record, [the ALJ] consider[s] supportability, consistency, relationship with the claimant, specialization, and other factors in accordance with 20 C.F.R. §§ 404.1520(c) and 416.920(c)." Doc. 10-3 at 24 (citation cleaned up).

However, with respect to Dr. Estock and Dr. Register, the ALJ did not properly apply those controlling regulations. As explained above, Dr. Estock and Dr. Register had substantially similar opinions regarding Moore's mental limitations—e.g., that Moore was "able to understand and remember simple instructions, but not detailed ones," that she was "able to carry out short and simple instructions," and that she could "attend and concentrate for [two hour] periods on simple tasks." Doc. 10-4 at 13–14, 30–31.

Dr. Estock and Dr. Register also both opined that Moore "would benefit from familiar repetitive work routine but should avoid excessive workloads, quick decision making, rapid changes and multiple changes," that her ability to interact with the general public was "[m]oderately limited," that "[c]ontact with the public should be casual," and that "[f]eedback from coworkers and supervisors should be tactful, nonconfrontational and supportive." Doc. 10-4 at 14, 31.

Dr. Estock and Dr. Register both opined further that Moore "could adapt to infrequent, well explained changes." Doc. 10-4 at 14, 32.

### B. The ALJ's consideration of the opinions of Dr. Estock and Dr. Register at step three (SSA Listings)

As also explained above, in evaluating Moore's mental impairments at step three of the sequential analysis, the ALJ embraced the opinions of Dr. Estock and Dr. Register. In particular, the ALJ stated as follows:

- "In understanding, remembering, or applying information, the claimant has

22

moderate limitations.  The claimant did not allege any particular issues in this area.  However, the claimant also stated that she could perform simple maintenance, prepare meals, go to doctor's appointments, take medications, shop, and drive.  In addition, the record shows that the claimant was able to provide information about her health, describe her prior work history, and respond to questions from medical providers.  <u>Robert Estock, M.D., a State Agency psychiatrist</u>, evaluated the claimant's records in September 2020 and assessed her with a moderate limitation in this criterion.  <u>Angela Register, Ph.D., a State Agency psychologist</u>, evaluated the claimant's records in October 2020 on reconsideration and assessed the claimant with a moderate limitation.  Upon review and consideration, the claimant has no more than a moderate limitation in this criterion."

- "In interacting with others, the claimant has moderate limitations.  The claimant did not allege any problems related to this domain.  However, according to her statements, the claimant is also able to get along with others, shop, spend time with friends and family, deal appropriately with authority, and live with others.  <u>Drs. Estock and Register</u> assessed the claimant with a moderate limitation in this criterion.  Upon review and consideration, the claimant has no more than a moderate limitation in this criterion."

- "The next functional area addresses the claimant's ability to concentrate, persist, or maintain pace.  For this criterion, the claimant has moderate limitations.  The claimant did not note any specific issues in this area.  Moreover, the claimant said that she is able to drive, prepare meals, watch television and manage funds.  <u>Drs. Estock and Register</u> assessed the claimant with a moderate limitation in this criterion.  Upon review and consideration, the claimant has no more than a moderate limitation in this criterion."

- "Finally, the claimant has mild limitations in her ability to adapt or manage herself.  The claimant did not allege any symptoms or limitations that relate to this criterion.  The claimant also stated that she is able to handle self-care and personal hygiene.  The objective evidence in the record showed the claimant to have appropriate grooming and hygiene and normal mood and affect.  <u>Drs. Estock and Register</u> assessed the claimant with a mild limitation in this criterion.  Upon review and consideration, the claimant has no more than a mild limitation in this criterion."

- "The [ALJ] has also considered whether the 'paragraph C' criteria are satisfied.  <u>Drs. Estock and Register</u> found the evidence did not establish the presence of 'paragraph C' criteria.  In this case, the evidence fails to establish

the presence of the 'paragraph C' criteria."

Doc. 10-3 at 20–21 (citations omitted; emphasis added).

    **C.**    **The ALJ's consideration of the opinions of Dr. Estock and Dr. Register at step four (mental RFC determination)**

The ALJ then connected up the consideration of the SSA's Listings regarding mental impairments (at step three), as to which the ALJ had embraced the opinions of Dr. Estock and Dr. Register, with the mental RFC determination (at step four): "The limitations identified in the 'paragraph B' criteria are not a residual functional capacity [RFC] assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning.  The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis."  Doc. 10-3 at 21.

As part of the mental RFC determination, the ALJ again reviewed the opinions of Dr. Estock and Dr. Register.  Doc. 10-3 at 23–24.  The ALJ stated that "Dr. Estock thought the claimant was able to understand and remember simple instructions, but not detailed ones.  He thought the claimant was able to carry out short and simple instructions and attend and concentrate for two-hour periods on simple tasks.  He thought the claimant would benefit from familiar repetitive work routine but should

avoid excessive workloads, quick decision making, rapid changes and multiple changes. Contact with the public should be casual. Feedback from coworkers and supervisors should be tactful, nonconfrontational and supportive. He thought the claimant could adapt to infrequent, well explained changes." Doc. 10-3 at 23 (citation omitted).

The ALJ also stated that "Dr. Register thought the claimant was able to understand and remember simple instructions, but not detailed ones. She thought the claimant was able to understand and remember simple instructions, but not detailed ones. She thought the claimant was able to carry out short and simple instructions and attend and concentrate for two-hour periods on simple tasks. She thought the claimant would benefit from familiar repetitive work routine but should avoid excessive workloads, quick decision making, rapid changes and multiple changes. Contact with the public should be casual. Feedback from coworkers and supervisors should be tactful, nonconfrontational and supportive. She thought the claimant could adapt to infrequent, well explained changes." Doc. 10-3 at 23–24 (citation omitted).

However, while the ALJ embraced the opinions of Dr. Estock and Dr. Register at step three, the ALJ determined at step four that—with respect to Moore's mental RFC—those opinions were only "somewhat persuasive." Doc. 10-3 at 24.

According to the ALJ, "the opinions of the non-examining State Agency

psychiatrist, Dr. Estock, and psychologist, Dr. Register, [were] somewhat persuasive." Doc. 10-3 at 24. Consistent with the ALJ's acceptance of the opinions of Dr. Estock and Dr. Register at step three, the ALJ first found that "[t]heir opinions [were] largely consistent with the medical evidence of record and supported by the claimant's allegations," and recognized that—at step three—the ALJ "ha[d] adopted their B criteria findings." Doc. 10-3 at 24.

Nevertheless, the ALJ then determined, "[h]owever," that "hearing level evidence, as outlined above, reveal[ed] that the claimant's residual functional capacity [wa]s not entirely consistent with the opinions. Their use of language if language that is not defined by the *Dictionary of Occupational Titles* was not considered and as such the undersigned arrived at the above noted residual functional capacity." Doc. 10-3 at 24.

As a threshold matter, it appears that the ALJ rejected the opinions of Dr. Estock and Dr. Register at least to the extent that those opinions included mental limitations for avoiding excessive workloads, avoiding quick decision making, and for supportive and non-confrontational interaction with coworkers and supervisors. *See, e.g.*, Doc. 10-3 at 21; Doc. 13 at 17. But that is an inferential "best guess" based on limitations that are *not* listed in the ALJ's mental RFC determination. *See* Doc. 10-3 at 21. It is uncertain to what extent the ALJ rejected those opinions, because the ALJ did not explain as much.

It also is uncertain why the ALJ rejected those opinions (at least to some degree), because the ALJ did not explain those reasons either.   Contrary to the Commissioner's argument on appeal, "in [the ALJ's] decision," the ALJ did not "appropriate[ly] indicate[] the reasons" Dr. Estock's and Dr. Register's "opinions were not fully persuasive."  *See* Doc. 16 at 13.

First, the ALJ does not appear to address the supportability factor at all.  *See* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).  Practically speaking, the opinions of Dr. Estock and Dr. Register do not include robust discussion of the bases for those opinions, because they were consultants and not treating providers; and it very well may be that, with respect to such consultants, consideration of the supportability and consistency factors will largely—if not completely—overlap.  *See also Thaxton v. Kijakazi*, No. 1:20-CV-00616-SRW, 2022 WL 983156, at *8 (M.D. Ala. March 30, 2022) ("[T]he ALJ need not use any magic words in discussing whether a medical opinion is supported by evidence from the medical source himself and whether the opinion is consistent with other evidence of record.").  But the ALJ still was required to have explained the ALJ's consideration of the supportability factor.  *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  And, at least in part, consideration of the fact that Dr. Estock and Dr. Register were consultants implicates one or more of the other factors under the applicable regulations anyway.  *See* 20 C.F.R. §§ 404.1520c(c), 416.920c(c) (consideration of the relationship with the claimant, including the length

of the treatment relationship, the frequency of examinations, and other factors, including evidence showing that the medical source has familiarity with other evidence or an understanding of the SSA's policies and evidentiary requirements).

Next (as just noted above), with respect to consistency, the ALJ first found that the opinions of Dr. Estock and Dr. Register "[we]re largely consistent with the medical evidence of record and supported by the claimant's allegations,"[2] before then determining that Moore's mental RFC "is not entirely consistent with the opinions."   Doc. 10-3 at 24; *see* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). According to the ALJ, that determination was based on "hearing level evidence, as outlined above."  Doc. 10-3 at 24.

In this regard, the ALJ had stated previously in the decision that, "[m]entally, the claimant was treated for depression, anxiety and alcohol abuse.  Treatment for depression and anxiety has been through her primary doctor and included medications such as lexopro/Seroquel, buproprion HCL, quetiapine, and prazosin.

---

[2] To the extent that the ALJ's statement addresses the supportability factor, this statement arguably suggests that the ALJ's consideration of the supportability factor would weigh in favor of determining that the opinions of Dr. Estock and Dr. Register were persuasive.  *See* Doc. 10-3 at 24 ("Their opinions are largely consistent with the medical evidence of record and *supported by* the claimant's allegations." (emphasis added)); *see also* Doc. 10-3 at 24 (ALJ finding "the opinion of the non-examining State agency physicians, Drs. Amason and Hogan, to be persuasive" because those "opinions on the physical residual functional capacity are consistent with the medical evidence of record and well *supported by* the claimant's stated activities of daily living" (citation omitted; emphasis added)).

There had been no inpatient hospitalizations and little professional mental health treatment or counseling.  In June 2020, she was noted to have good judgment, was active, alert and depressed but oriented to time, place and person.  Her recent memory and remote memory were normal.  In July 2021, she was noted to have good judgment, with normal mood and affect.  It appears the claimant's alcohol consumption had continued.  Overall, her record is remarkably normal.  It includes complaints of . . . mild depression. . . . [D]uring the time period at issue, the claimant could drive, prepare simple meals and do simple chores.  There is no evidence of any functional limitations not accommodated by the [RFC] herein."  Doc. 10-3 at 22–23 (citations omitted).

But, the ALJ did not explain whether or how these findings were inconsistent with the opinions of Dr. Estock and Dr. Register.  Nor did the ALJ explain whether or how these findings provided a basis to reject those opinions—to some uncertain degree.

Previously in the ALJ's decision, the ALJ also had stated the following:  "The undersigned fully considered the medical opinions and prior administrative medical findings in this claim, but because the undersigned has the benefit of the entirety of the claimant's medical records and the additional testimony and evidence presented at the hearing, the undersigned rarely finds opinions to be simply 'persuasive' or 'not persuasive,' either accepting them word-for-word or rejecting them altogether.

There are almost always discrepancies, however small, between the specific opinions and limitations noted by a medical source or administrative medical finding, and the limitations reflected in the claimant's residual functional capacity. Any such discrepancies are based on my independent review, my consideration of the claimant's testimony and other evidence from the hearing, and all other evidence in the claim, some of which may not have been available to the source at the time of the expressed opinions. The undersigned has attempted to articulate the reasons for any such discrepancies throughout this decision." Doc. 10-3 at 24.

But (again), with respect to Dr. Estock and Dr. Register, the ALJ did not "articulate the reasons for any such discrepancies," and did not explain whether or how their opinions were inconsistent with the record evidence. Doc. 10-3 at 24.

\*          \*          \*

In sum, the ALJ may have concluded that the opinions of Dr. Estock and Dr. Register were not fully persuasive based on the evidence regarding Moore's mental impairments that the ALJ reviewed as part of the RFC determination (Doc. 10-3 at 22–23), based on the ALJ's "independent review, [the ALJ's] consideration of [Moore's] testimony and other evidence from the hearing, and all other evidence in the claim" (Doc. 10-3 at 24), because Dr. Estock and Dr. Register used "language that is not defined by the *Dictionary of Occupational Titles*" and that "was not considered" (Doc. 10-3 at 24), and/or because the ALJ concluded that the mental

limitations that Dr. Estock and Dr. Register included in their opinions but that the ALJ did not accept in the mental RFC determination just didn't matter. But, in light of the ALJ's decision, this would be guesswork. As a result, the court cannot say that substantial evidence supported the ALJ's mental RFC determination.

Candidly, this is a close call; and, on remand, there may be an easy fix for the Commissioner. For instance, there may be ample evidence to support the determination that the opinions of Dr. Estock and Dr. Register are only partially persuasive. But, for now, the court cannot "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see, e.g.*, *Delgado v. Commissioner of Soc. Sec.*, No. 20-14234, 2021 U.S. App. LEXIS 27091, at *14 (11th Cir. Sept. 9, 2021) (vacating and remanding in relevant part because the ALJ "afforded [an evaluating psychologist's] opinion little weight on the grounds that it [was] 'not supported by the record,'" and reasoning that "[t]he ALJ never specified what evidence in the record fail[ed] to support [the psychologist's] opinion. The failure makes the ALJ's decision to discount [the psychologist's] opinion difficult to evaluate with any sort of precision"); *see also Armstrong v. Commissioner of Soc. Sec.*, 546 F. App'x 891, 896 (11th Cir. 2013) (reversing and remanding where it was "unclear whether the ALJ applied the proper legal standards or whether [the ALJ's] finding at step three was supported by substantial evidence").

31

The ALJ did not adequately explain how the ALJ considered the supportability and consistency factors with respect to the opinions of Dr. Estock and Dr. Register (20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2)), and consequently the court cannot conclude that substantial evidence supported the ALJ's mental RFC determination.

## II. The court pretermits consideration of the other issue that Moore raised in this appeal.

Because the court will reverse and remand for further consideration of the opinions of Dr. Estock and Dr. Register (*see supra* Part I), the court pretermits consideration of the other issue that Moore raised in this appeal. As noted above, Moore also has argued that the ALJ erred in evaluating Moore's symptoms, including her subjective testimony regarding those symptoms. *See, e.g.*, Doc. 13 at 10–15; Doc. 19 at 1–4.

But the court need not—and will not—reach this issue. *See Demenech v. Secretary of Dep't of HHS*, 913 F.2d 882, 884 (11th Cir. 1990) (per curiam) (court need not consider other issues when remanding); *accord Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam).

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this memorandum opinion. The court separately will

enter final judgment.

**DONE** and **ORDERED** this September 25, 2023.

_____

**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE